JUDGE HOLWELL

08 CV 5694

Michael J. Frevola
Christopher R. Nolan
Ji Hi Jung
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
BROSTRÖM TANKERS AB




UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BROSTRÖM TANKERS AB,

Plaintiff,

-against-

PROJECTOR S.A.,

Defendant.

08 Civ. _____

**VERIFIED COMPLAINT**

Plaintiff, Broström Tankers AB ("Plaintiff" or "Broström"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Projector SA ("Defendant" or "Projector"), alleges as follows:

1. This is a case of admiralty and maritime jurisdiction under 28 U.S.C. § 1333 as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2. At all times material herein, plaintiff Broström was and is a business entity organized and existing under the laws of the Kingdom of Sweden and maintains its principal place of business at Östra Hamngatan 7, 403 30 Göteborg, Sweden.

3. Upon information and belief, at all times material herein, Projector is a business entity organized and existing under the laws of a foreign country having a place of business located at 35A Regent Street, Belize City, Belize.

4. In October 2007, Broström and Projector entered into a Voyage Charterparty whereby Broström chartered the vessel BRO PROVIDER ("Vessel") to Projector on the ASBATANKVOY form, as amended between the parties, dated 11 October 2007 with express reference to "GA/arb London/English law" (the "Charter"). True and correct copies of the Charter's fixture message and ASBATANKVOY form are annexed as Exhibit 1.

5. Under the terms of the Charter, the parties agreed to a demurrage rate of US$20,000 per day or pro rata. Total laytime allowed under the Charter was 84 hours (Sundays and holidays included).

6. While performing the voyage under the Charter, the Vessel exceeded allowed laytime and incurred demurrage. Broström presented a demurrage claim to Projector with supporting documentation on or about November 6, 2007, requesting payment of US$144,861.11. A true and correct copy of the demurrage claim is annexed as Exhibit 2.

7. In breach of Projector's obligations under the Charter, Projector failed to pay the amount owed.

8. As a result of the foregoing and Projector's breach of its obligations under the Charter, Broström has suffered damages in the principal amount of US$144,861.11.

9. Upon information and belief, it will take two years for Broström to prosecute this claim against Projector to its completion. As stated above, the Charter is governed by English law. Under English law, Broström is entitled to receive its interest, expenses and reasonable

attorneys' fees for prosecuting its claims to completion, which amount is estimated to be US$64,486.11 as set forth below:

| | | |
|---|---|---|
| Principal Amount: | $144,861.11 | |
| Interest: | $ 14,486.11 | (US$144,861.11 x 0.05/year x 2 yrs.) |
| Attorneys' Fees/Expenses: | $ 50,000.00 | |
| **Total:** | **$209,347.22** | |

10. Therefore, as a result of the foregoing and Projector's breach of its obligations under the Charter, Broström has suffered damages in the amount of US$209,347.22 including estimated interest, attorneys' fees and expenses.

11. Projector is not found within the Southern District of New York but does have goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, is claimed by it, is being held for it or on its behalf, or which is being transferred for its benefit, within the jurisdiction and held in the name of Projector S.A. with, upon information and belief, the following financial institutions: Bank of America, N.A.; Bank of China; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; Bank of Tokyo-Mitsubishi UFJ Ltd.; or any other financial institution within the Southern District of New York.

12. Broström has demanded that Projector arbitrate this dispute in London and has appointed an arbitrator. While all disputes arising out of the Charter are to be arbitrated in London, the action herein is submitted in accordance with Rule B of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure, as well as 9 U.S.C. §8, and is not and cannot be considered a waiver of the parties' agreement to arbitrate.

**WHEREFORE**, Broström demands judgment as follows:

1. That a summons with process of attachment and garnishment may issue against the defendant, Projector S.A.; and if defendant cannot be found, then that its goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, is claimed by it, is being held for it or on its behalf, or which is being transferred for its benefit, within the district may be attached in an amount sufficient to answer plaintiff's claim;

2. That Projector S.A. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3. That judgment be entered in favor of Broström Tankers AB and against Projector S.A. in the amount of US$209,347.22 (including estimated interest, expenses and attorneys' fees); and,

4. That this Court grant Broström Tankers AB such other and further relief which it may deem just and proper.

Dated: New York, New York
June 24, 2008

HOLLAND & KNIGHT LLP

By: [signature]

Michael J. Frevola
Christopher R. Nolan
Ji Hi Jung
195 Broadway
New York, NY 10007-3189
Tel: (212) 513-3200
Fax: (212) 385-9010

*Attorneys for Plaintiff*
*Broström Tankers AB*

**VERIFICATION**

STATE OF NEW YORK )
:ss.:
COUNTY OF NEW YORK )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for Broström Tankers AB ("Broström"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Broström and corresponded with Broström's representatives regarding this matter. I am authorized by Broström to make this verification, and the reason for my making it as opposed to an officer or director of Broström is that there are none within the jurisdiction of this Honorable Court.

[signature]
Michael J. Frevola

Sworn to before me this
24th day of June, 2008

[signature: Wallis Beth Karpf]
Notary Public

WALLIS BETH KARPF
Notary Public, State Of New York
No. 01KA6047092
Qualified In New York County
Commission Expires August 28, 20 10

# 5423773_v1

# EXHIBIT 1

Reference number 00801F5C Exp. date 10.01.2008 Created 12.10.2007 01:48:17

From <chartering@crweber.com> Company Brostrom
To <chartering@crweber.com> Department Fleet, Pacific, Atlantic, Accounts

Subject BRO PROVIDER/PROJECTOR C/P 10/11/07

FROM: <chartering@crweber.com>
DATE: 11-OCT-2007 19:19
MSG.: 2519685

Charles R Weber

TO : FR8
ATTN : MALCOLM FRANCIS

CC : BROSTOM
ATTN : SIGMUND AARNES

**** STRICTLY PRIVATE AND CONFIDENTIAL ****

WE ARE PLEASED TO CONFIRM THE FOLLOWING FIXTURE ON THE BELOW TERMS AND CONDITIONS WITH ALL SUBJECTS LIFTED:

---

(TITLE)

| | |
|---|---|
| CHARTERER | : PROJECTOR S/A OR ITS GUARANTEED NOMINEE |
| OWNERS | : BROSTROM TANKERS AB |
| BROKER | : CHARLES R. WEBER CO, INC. |
| CO-BROKER | : NONE |
| PRIVATE AND CONFIDENTIAL | : YES |
| CHARTER PARTY | : ASBATANKVOY |
| DATED | : OCTOBER 11, 2007 |

---

(VESSEL)

| | |
|---|---|
| SHIP | : BRO PROVIDER |
| SDWT | : 31,686 METRIC TONNES |
| DRAUGHT | : 10.21 METRES |
| LOA | : 176.5 METRES |
| BEAM | : 27.7 METRES |
| BUILT | : 2001 |
| FLAG | : SWEDISH |

---

(VESSEL DETAILS)

CAPACITY AT 98 PCT : 37,359 CUBIC METRES INCL 1 SLOP TANK
SLOP TANK CAPACITY : 1,014 CUBIC METRES AT 98 PCT RESIDUAL TANK (NOT AVAILABLE FOR CARGO CARRIAGE)
CLASS: DNV
TPC 42.55 MT
KTM 44.0 M
BCM 89,3 M
DOUBLE HULL

```
CARGO SEGREGATIONS          : 8
DEEPWELL CARGO PUMPS : YES
IGS                         : YES
VRS                         : YES
CARGO HEATING DEVICE        : YES(HEAT EXCHANGERS)
TANK COATING                : ZINK
DERRICK(S)                  : 1X10 TONS CRANE
BALLAST ARRANGEMENT         : SBT(DOUBLE HULL)
BOWCHAIN STOPPER      : YES
PANDI CLUB                  : GARD
HULL AND MACHENERY VALUE: USD 31 MILLION
IMO II + III

TTBOOK VSL NOT REPORTED UNACCEPTABLE TO FOLLOWING OIL COMPANIES

BP                    JAN 22, 2009
CDI                         MAR 12, 2008
CHEVRON               USING SIRE
CONOCOPHILLIPS              USING SIRE
SHELL                 USING SIRE
CEPSA                 USING SIRE
TOTAL                 USING SIRE
STATOIL               USING SIRE
LYONDELL              MAR 12, 2008

1ST LAST                 : UNLD GASOLINE
2ND LAST CARGO           : REFORMATE/ALKYLATE
3RD LAST CARGO           : METHANOL

FULL ITINERARY           : VSL PROMPT PORT LIMON 10TH.
                           ETA BASIS USG 14TH OCT.
-----------------------------------------------------------------------

CARGO QUANTITY           : CHARTERERS' OPTION UPTO FULL CARGO

GRADE                    : CLEAN PETROLEUM PRODUCT UNLEADED, UNDYED,
                           UNDARKER THAN 2.5 NPA ALWAYS EXCL
                           LUBES/CASINGHEADS/CHEMICALS/SOLVENTS/CYCLE
OIL

SEGREGATION              : 1/2 GRADE(S) WITHIN VESSEL'S
                           NATURAL SEGREGATION

HEAT                     : NOT APPLICABLE

-----------------------------------------------------------------------
                         (DATES)

LAYDAYS                  : OCTOBER 18/20 0001 HRS - 2359 HRS OR CHOPT
                           OCTOBER 17/19 0001 HRS - 2359 HRS

-----------------------------------------------------------------------
                         (GEOGRAPHICAL)

LOADING RANGE            : 1/2 SP USG IF MISS RIVER NNOBI BATON ROUGE

DISCHARGING RANGE        : 1/3 SP/S-T-S ECUADOR  OR
                           1/3 SP/S-T-S WCCA NNOBI SAN JOSE

-----------------------------------------------------------------------
                         (FINANCIAL)

FREIGHT RATE             : LUMPSUM USD 665,000 BASIS ECUADOR 1:1
                           LUMPSUM USD 700,000 BASIS WCCA 1:1

- ABOVE RATES LESS 20K IF 17/19 LAYCAN.
```

- PLUS ADDITIONAL 50K IF MISS RIVER LOAD.

- ADDITIONAL 20K TO BE DEDUCTED FROM FREIGHT IF DISCHARGE FULL CARGO BY S-T-S ONLY, IN SUCH CASE ALL PORT COSTS FOR CHRTS ACCT EXCEPT FOR OWNERS MATTERS.

DEMURRAGE RATE : USD 20,000 PER DAY OR PRO RATA

LAYTIME : TOTAL 84 HOURS SHINC

---

(TERMS)

SPECIAL PROVISIONS:

NO DISCH/RELOAD OPTION FOR THIS VOYAGE

2ND PORT DISCH TO BE AS PER TORM INTERIM PORT CLAUSE

MAX PORT COST USD 30,000 FOR OWNERS ACCOUNT IN DISCH PORT(S)

OWNERS WEATHER CLAUSE

CONOCO WEATHER CLAUSE, EXCEPT IF LOAD/DISCHARGE:PUERTO LIMON/MOIN, EAST COAST MEXICO, ATLANTIC COLUMBIA SETE, FIUMICINO,FALCONARA, RAVENNA, GAETA, ANCONA, LA NOUVELLE,ZAWIA,SKIKDA, BLACK SEA,EC MEXICO SPANISH ATLANTIC PORTS ,PORTUGAL, STS, LIGHTERAGE, LIGHTENING, SPM, SBM, SEALINE TRANSHIPMENT, OPENBERTH, ANY DELAYS DUE TO BAD WEATHER AND/OR SEA CONDITIONS TO COUNT IN FULL AS LAYTIME OR DEMURRAGE, IF ON DEMURRAGE. ANY COSTS FOR UNBERTHING/ REBERTHING DUE TO BAD WEATHER INCLUDING SWELL FOR CHARTERERS ACCOUNT.

PANAMA CANAL CLAUSE

MAX 24 HRS WAITING TIME PRIOR PILOT ON BOARD FOR PANAMA CANAL CANAL TRANSIT IN LADEN FOR OWNERS ACCT. BALANCE IF ANY FOR CHTRS ACCT. SUCH LOST TIME TO BE COMPENSATED FOR IN FULL AT RATE OF DEMURRAGE PAYABLE TOGETHER WITH FREIGHT. IF CHTRS REQUIRE VSL PREEBOOKED FOR TRANSIT THROUGH PANAMA CANAL, SUCH PREEBOOKING FEE TO BE FOR CHTRS ACCT AND PAYABLE TOGETHER WITH FREIGHT. CHARTERERS ALWAYS TO HAVE THE BENEFIT OF 84 HOURS LAYTIME.

OBS!!

FURTHER TERMS AS PER STANDARD TERMS AGREED BETWEEN BROSTROM TANKERS NORWAY AND PROJECTOR LAST DONE ON BRO ALEXANDRE CP DD 05.09.2007 SUB REVIEW AND LOGICAL AMENDMENT'S

- OWNER'S OPTION TO BUNKER ENROUTE LADEN PASSAGE, SUBJECT TO CHARTERERS APPROVAL NOT TO BE UNREASONABLY WITHHELD.

- WSTC
- C/P FORM : ASBATANKVOY
- CHTRS AGENT BOTH ENDS PROVIDED COMPETITIVE RATE
- GA/ARB LONDON/ENGLISH LAW
- FREIGHT TO BE PAID IMMEDIATELY UPON COMPLETION OF DISCHARGE

- VESSEL SHOULD USE OUTSIDE ROUTE WHEN CALLING GLADSTONE - N/ A

- SKOREAN ANCH DUES FOR WAITING BERTH MAX 48HRS FOR OWNS A/C THEREAFTER CHTRS A/C - N/A

- ALL TAXES A/O DUES ON CARGO A/O FRT TO BE FOR CHTRS A/C AND SETTLE DIRECTLY BY THEM

- CANCELLATION CLAUSE:
IF IT BECOMES OBVIOUS TO THE OWNERS THAT THE VESSEL WILL NOT MEET HER CANCELING DATE, OWNERS TO NOTIFY CHARTERERS OF VESSELS ETA AND PROPOSED NEW CANCELING DATE. CHARTERERS HAVE THE OPTION TO CANCEL THE CHARTER WITHIN 2 WORKING DAYS OF NOTICE OR EXTEND IN ACCORDANCE WITH OWNERS NEW PROPOSED CANCELING DATE. IF CHARTERERS DECIDE TO CANCEL THE CHARTER, IT SHALL BE WITHOUT ANY FURTHER LIABILITIES TO EITHER PARTY, UNLESS VSSL'S POSITION HAS BEEN MISREPRESENTED BY OWNERS. IF CHARTERERS DO NOT CANCEL THE CHARTER WITHIN 2 WORKING DAYS AFTER RECEIPT OF OWNERS NOTICE, THE CHARTER PARTY IS MAINTAINED ON BASIS OF THE NEW CANCELING DATE PROPOSED BY THE OWNERS

- ARRANGEMENT OF SUPERINTENDENT AT DISPORT IN JAPAN AT OWNER'S ACCOUNT IF REQUIRED, BUT SUPERINTENDENT TO BE SUPPLIED AS PER NORMAL PRACTICE AND CUSTOM - N/A THIS VOYAGE

PROJECTOR VOYAGE CHARTERING TERMS, AMENDED 15TH APRIL 1999 WITH FOLLOWING AMENDMENTS:

1.GENERAL TERMS -
H) INSERT 'GUARD P&I CLUB'
2.AMENDMENTS TO THE ASBATANKVOY
C) FIRST LINE, DELETE "ALL CONVENIENT", INSERT "UTMOST"
D) DELETE CHTR'S AMENDMENTS AND PLS REMAIN CLS AS PRINTED
E) DELETE CHTR'S AMENDMENTS AND PLS REMAIN CLS AS PRINTED
G) DELETE CHTR'S AMENDMENTS AND PLS REAMIN CLS AS PRINTED
H) OWNER'S MAINTAIN WORDING
I) OWNERS MAINTAIN AS PRINTED SINCE WE HAVE TAX CLS IN MAIN TERMS
K) INSERT 'RIDER CLS 8' AFTER DELETING 'RIDER CLS 7'

3.BILL(S) OF LADING/INDEMNITY CLAUSE
A) REWRITE 'IF ALL THREE(3) BILLS OF LADING ARE NOT AVAILABLE AT DISCHARGE PORT(S) OR;
5TH PARA AT END OF LINE 2 INSERT 'OWNER'S P AND I CLUB WORDING FOR' BTWN 'FOLLOWING' AND 'INDEMNITY'
DELETE 1,2,3,4,5,6,7.8 AND INSERT OWNER'S P AND I WORDINGS
LAST PARA LINE 1 DELETE RELEVANT' AND INSERT 'ALL THREE(3)' 2 DELETE 'BILL' AND INSERT 'BILLS' 2/3 DELETE 'OR 13-----' TILL END OF LINE 3
ADD AT END" -ALL LETTER OF INDEMNITY (L.O.I.) ARE TO BE SIGNED/STAMPED WITH COMPANY LETTERHEAD AND MUST BE SENT DIRECTLY FROM THE CHARTERERS TO THE RESPECTIVE OWNERS/VESSELS NAMED IN THE FIXTURE IN THE FOLLOWING STIPULATION:

(A) FOR "BRO" PREFIX VESSEL,
TO BROSTROM VIA E-MAIL DULY SIGNED AND STAMPED,
E-MAIL : COMEX.WORLDWIDE.PARIS@BROSTROM.FR
ATTN: BERNARD PERRIN - N/A

(B) FOR VESSEL "GAN-VOYAGER, GAN-VENTURE, GAN-SURE, GAN-SHIELD, GAN-VALOUR, GAN-VICTORY, GAN-SPIRIT, GAN-SABRE"
TO: DUNYA SHIPPING VIA TELEX, FAX OR EMAIL
TELEX NO. 26301 GAND TR
FAX: 90-212-339 5656
EMAIL : CHARTERING@DUNYASHIPPING.COM - N/A

(C) FOR VESSEL '' SETO EAGLE''
TO EAGLE VIA EMAIL OR FAX DULY SIGNED AND STAMPED
EMAIL: MARINE@EAGLE-TOKYO.COM & CREW@EAGLE-TOKYO.COM
FAX: + 81-3-3292 4430 - N/A

(D) ALL LOIS TO BE COPIED TO
BROSTROM AS,
FAX: +47-3342-5210
EMAIL: PACIFIC@BROSTROM.NO
BROSTROM SANDEFJORD, ATTN: OPERATION DEPT " - N/A

(E) FOR "BRO PROVIDER, BRO PRIORITY, BRO PREMIUM AND BRO PROMOTION",
TO BROSTROM VIA E-MAIL DULY SIGNED AND STAMPED,
E-MAIL : ATLANTIC@BROSTROM.NO
ATTN: OPERATIONS

4.POSITION
LINE 1/2 DELETE 'OWNERS WARRANT THAT' AND INSERT 'TO THE BEST OF OWNER'S KNOWLEDGE' POSITION/ITINERARY - ASP RECAP
5.ADDRESS COMMISSION
6.WEATHER - DELETE, SEE MAIN TERMS
7.THIRD PARTY ARREST CLAUSE
2ND LINE AFTER 'ANY' AND BEFORE 'DAMAGES' INSERT 'PROVEN'
8.LAW AND LITIGATION CLAUSE
9.CLAIMS CLAUSE
LINE 4 AFTER '90 DAYS' INSERT 'FOR DEMURRAGE CLAIM AND 120 DAYS FOR OTHER CLAIMS'
10.OVER-AGE INSURANCE - DELETE N/A
11.WAR RISK CLAUSE
12.ADDITIONAL OIL POLLUTION INSURANCE
C)I) AND II) ADD AT END 'IF REQUESTED' RESPECTIVELY III) DELETE
13. CARGO RETENTION CLAUSE
LINE 2 DELETE 'DEDUCT FROM FREIGHT' AND INSERT 'CLAIM'
LINE 4 INSERT 'FIXED' BTWN 'VESSEL'S' AND 'PUMPS'
LINE 7 INSERT 'AN INDEPENDENT' BEFORE 'SURVEYOR'
14.DRUG AND ALCOHOL ABUSE CLAUSE
15 INTERNATIONAL SAFETY MANAGEMENT (ISM) CODE
PARA 2 LINE 1 AFTER 'OWNER SHALL' DELETE 'INDEMNIFY THE CHARTERER FOR' AND
INSERT 'BE RESPONSIBLE FOR ANY PROVEN"
LINE 2 DELETE 'INDIRECTLY'
16. OIL COMPANY APPROVALS CLAUSE
LINE 1 DELETE 'OWNER WARRANTS THAT' AND INSERT 'TO THE BEST OF OWNER'S KNOWLEDGE'
INSERT OIL COMPANY APPROVAL: 'AS PER MAIN TERMS'
17.ELIGIBILITY CLAUSE
LINE 1 DELETE 'OWNERS WARRANT' AND INSERT 'TO THE BEST OF OWNERS KNOWLEDGE'
LINE 6 BEFORE 'DAMAGES OR EXPENSES' INSERT 'PROVEN'
AT THE END OF THE CLAUSE INSERT 'THIS CLAUSE DOES NOT APPLY TO VESSEL'S TECHNICAL/PHYSICAL CHARACTERISTICS BUT ONLY TO HER DOCUMENTATION'
18.UNITED STATES OIL POLUTION ACT OF 1990 (OPA-90)
19.PARAGRAPH 3 DELETE 'TO INDEMNIFY CHARTERER' INSERT 'TO BE RESPONSIBLE FOR'
20.U.S CUSTOMS REGULATION CLAUSE
21.ISPS - DELETE AND REPLACE WITH REVISED BIMCO CLS - 2005

REVISED BIMCO CLS - 2005
ISPS/MTSA CLAUSE FOR VOYAGE CHARTER PARTIES 2005

(A)(I) THE OWNERS SHALL COMPLY WITH THE REQUIREMENTS OF THE INTERNATIONAL CODE FOR THE SECURITY OF SHIPS AND OF PORT FACILITIES AND THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE)Â RELATING TO THE VESSEL AND ÂCOTHE COMPANYÂC? (AS DEFINED BY THE ISPS CODE). IF TRADING TO OR FROM THE UNITED STATES OR PASSING THROUGH UNITED STATES WATERS, THE OWNERS SHALL ALSO COMPLY WITH THE REQUIREMENTS OF THE US MARITIME TRANSPORTATION SECURITY ACT 2002 (MTSA) RELATING TO THE VESSEL AND THE OWNER(AS DEFINED BY THE MTSA).

(II) UPON REQUEST THE OWNERS SHALL PROVIDE THE CHARTERERS WITH A COPY OF THE RELEVANT INTERNATIONAL SHIP SECURITY CERTIFICATE (OR THE INTERIM INTERNATIONAL SHIP SECURITY CERTIFICATE) AND THE FULL STYLE CONTACT DETAILS OF THE COMPANY SECURITY OFFICER (CSO).

(III) LOSS, DAMAGES, EXPENSE OR DELAY (EXCLUDING CONSEQUENTIAL LOSS, DAMAGES, EXPENSE OR DELAY) CAUSED BY FAILURE ON THE PART OF THE OWNERS OR THE COMPANY/OWNER TO COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE/MTSA OR THIS CLAUSE SHALL BE FOR THE OWNERS' ACCOUNT, EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY.

(B)(I) THE CHARTERERS SHALL PROVIDE THE OWNERS AND THE MASTER WITH THEIR FULL STYLE CONTACT DETAILS AND, UPON REQUEST, ANY OTHER INFORMATION THE OWNERS REQUIRE TO COMPLY WITH THE ISPS CODE/MTSA.

(II) LOSS, DAMAGES OR EXPENSE (EXCLUDING CONSEQUENTIAL LOSS, DAMAGES OR EXPENSE) CAUSED BY FAILURE ON THE PART OF THE CHARTERERS TO COMPLY WITH THIS CLAUSE SHALL BE FOR THE CHARTERERS' ACCOUNT, EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, AND ANY DELAY CAUSED BY SUCH FAILURE SHALL COUNT AS LAYTIME OR TIME ON DEMURRAGE.

(C) PROVIDED THAT THE DELAY IS NOT CAUSED BY THE OWNERS' FAILURE TO COMPLY WITH THEIR OBLIGATIONS UNDER THE ISPS CODE/MTSA, THE FOLLOWING SHALL APPLY:

(I) NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED IN THIS CHARTER PARTY, THE VESSEL SHALL BE ENTITLED TO TENDER NOTICE OF READINESS EVEN IF NOT CLEARED DUE TO APPLICABLE SECURITY REGULATIONS OR MEASURES IMPOSED BY A PORT FACILITY OR ANY RELEVANT AUTHORITY UNDER THE ISPS CODE/MTSA.

(II) ANY DELAY RESULTING FROM MEASURES IMPOSED BY A PORT FACILITY OR BY ANY RELEVANT AUTHORITY UNDER THE ISPS CODE/MTSA SHALL COUNT AS LAYTIME OR TIME ON DEMURRAGE, UNLESS SUCH MEASURES RESULT SOLELY FROM THE NEGLIGENCE OF THE OWNERS, MASTER OR CREW OR THE PREVIOUS TRADING OF THE VESSEL, THE NATIONALITY OF THE CREW OR THE IDENTITY OF THE OWNERS' MANAGERS.

(D) NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED IN THIS CHARTER PARTY, ANY COSTS OR EXPENSES WHATSOEVER SOLELY ARISING OUT OF OR RELATED TO SECURITY REGULATIONS OR MEASURES REQUIRED BY THE PORT FACILITY OR ANY RELEVANT AUTHORITY IN ACCORDANCE WITH THE ISPS CODE/MTSA INCLUDING, BUT NOT LIMITED TO, SECURITY GUARDS, LAUNCH SERVICES, VESSEL ESCORTS, SECURITY FEES OR TAXES AND INSPECTIONS, SHALL BE FOR THE CHARTERERS ACCOUNT, UNLESS SUCH COSTS OR EXPENSES RESULT SOLELY FROM THE NEGLIGENCE OF THE OWNERS, MASTER OR CREW OR THE PREVIOUS TRADING OF THE VESSEL, THE NATIONALITY OF THE CREW OR THE IDENTITY OF THE OWNERS' MANAGERS. ALL MEASURES REQUIRED BY THE OWNERS TO COMPLY WITH THE SHIP SECURITY PLAN SHALL BE FOR THE OWNERS' ACCOUNT.

(E) IF EITHER PARTY MAKES ANY PAYMENT WHICH IS FOR THE OTHER PARTY ACCOUNT ACCORDING TO THIS CLAUSE, THE OTHER PARTY SHALL INDEMNIFY THE PAYING PARTY.

FOOTNOTE: THIS CLAUSE REPLACES PREVIOUSLY PUBLISHED ISPS CLAUSE FOR VOYAGE CHARTER PARTIES AND THE US SECURITY CLAUSE FOR VOYAGE CHARTER PARTIES, BOTH OF WHICH ARE NOW OFFICIALLY WITHDRAWN

22.VGO/LSWR CLAUSE - DELETE
23.PART CARGO
ADD AT END, PROVIDED THAT CHARTERER TO ISSUE LOI FOR COMINGLING OPERATION ASPER OWNER'S P AND I CLUB WORDING'
24.COMMINGLE CLAUSE - ADD AT END ', PROVIDED THAT CHARTERER TO ISSUE LOI FOR COMINGLING OPERATION AS PER OWNER'S P AND I CLUB WORDING'
25.HEATING CLAUSE - DELETE N/A
26.SAMPLING CLAUSE - INSERT 'AND BUNKER COST' AFTER 'PORT COSTS'
27.BLENDING CLAUSE - DELETE
28.LIGHTERAGE CLAUSE - DELETE 'FREE TO SAIL' AND INSERT 'LAST LINE/FENDER IS OFF AND LIGHTER VESSEL HAS SAILED'
29.PUMPING CLAUSE
LINE 1 AFTER 'MAINTAIN' INSERT 'AN AVERAGE OF'
LINE 2 AFTER 'RAIL' INSERT 'EXCLUDING STRIPING BUT MAX 3 HOURS'
ADD AT END OF 1ST PARA AFTER 'TERMINAL' 'IF OBTAINABLE'
30.DIVERSION CLAUSE
31.INTERIM PORT CLAUSE DELETE AND REPLACE BY CHARTERERS TO PAY FOR ADDITIONAL INTERIM LOAD/DISCHARGE PORT AT COST WITH ADDITIONAL

STEAMING
TIME TO BE INCURRED FOR SUCH DEVIATION WHICH EXCEEDS DIRECT PASSAGE FROM
FIRST LOADPORT TO FINAL DISCHARGE PORT. TIME TO COUNT FROM ARRIVAL PILOT
STATION INTERIM LOAD/DISCH PORT UNTIL DROPPING LAST OUTWARD PILOT INTERIM
LOAD/DISCH PORT I.E. NO ALLOWANCE FOR NOTICE TIME, NOR DEDUCTION FOR
SHIFTING EVEN FROM ANCHORAGE TO SECOND BERTH (CHARTERERS TO HAVE THE
ADVANTAGE OF SHIFTING FROM ANCHORAGE TO FIRST BERTH) AND NO DEDUCTION FOR
TIME LOST DUE TO TIDE, SEA AND WEATHER CONDITIONS. DEVIATION AND TIME USED
TO BE CALCULATED AT THE USD $20,000 PER DAY PRO RATA PLUS COST FOR
ADDITIONAL BUNKERS CONSUMED AT COSTS AS PER MASTERS TELEX STATEMENT.

DEVIATION, TIME USED, BUNKERS CONSUMED AND PORT COSTS PER AGENTS TELEXED D/A
TO BE PAID TOGETHER WITH FREIGHT AS PER OWNERS TELEXED INVOICE, WHICH LATER
TO BE SUPPORTED BY HARD COPY DOCUMENTATION.

32.OPERATIONS CLAUSE
A)CLEAN BALLAST DELETE AND INSERT 'VESSEL TO ARRIVE AT LOAD PORT WITH CLEAN
BALLAST ONLY'
B)DELETE N/A
33.AGENTS CLAUSE - AT END ADD 'PROVIDED SUCH AGENTS ARE COMPETITIVE'
34.OPERATIONAL COMPLIANCE CLAUSE
LINE 2 DELETE 'OWNER SHALL INDEMNIFY CHARTERER' INSERT 'TO BE RESPONSIBLE'
35.EARLY LOADING
LINE 1 DELETE 'ALL' AND INSERT 'HALF'
LINE 2 AFTER 'AGAINST' DELETE 'TIME USED AT DISCHARGE PORT(S) AND
INSERT 'USUAL LAYTIME'
36.CARGO DOCUMENTS CLAUSE
AT THE END ADD 'IF MORE THAN 3 HOURS, THEN ALL TIME TO COUNT UNTIL
VESSEL IS RELEASED'
37.EXCESS BERTH OCCUPANCY CLAUSE
LINE 2 DELETE ',OR INDIRECT'
38.WAITING VOYAGE ORDERS CLASUE
39.SPEED CLAUSE
1ST PARA LINE 1 INSERT 'ABOUT 14.5 KNOW WSNP'
DELETE 2ND, 3RD AND 4TH PARA.
40.SOUTH EAST ASIA - N/A

---

(COMMISSIONS)

1.25 PERCENT ADDRESS COMMISSION TO CHARTERERS ON FREIGHT/DEMURRAGE, DEDUCTIBLE AT SOURCE.
1.25 PERCENT COMMISSION TO FR8 ON FREIGHT/DEMURRAGE.
1.25 PERCENT BROKERAGE COMMISSION CR WEBER TO ON FREIGHT/DEMURRAGE.

---

(BROKER DETAILS)

CHARLES R. WEBER COMPANY
BROKER:
DAN O'DONNELL JR.
OFFICE TEL: 1-203-629-2300

EMAIL: CHARTERING@CRWEBER.COM
AOH TEL: 1-203-550-1615

---

END RECAP.

THANKS FOR YOUR SUPPORT IN CONCLUDING THE ABOVE BUSINESS ON YOUR BEHALF

REGARDS
DAN O'DONNELL JR./MATT HEINEMANN
CR WEBER






Projector - Voyage Chartering Terms

1. GENERAL TERMS.
   a) Asbatankvoy Charterparty.

   b) "Worldscale" terms and conditions as at date of Charterparty.

   c) Eighty four (84) hours laytime allowance

   d) York/Antwerp Rules 1974, as amended 1990 and 1994

   e) Freight payable in United States Dollars to the Owner's nominated account by telegraphic transfer.

   f) The negotiation and fixture to remain private and confidential at all times.

   g) Owner warrants that throughout the duration of this charter, the vessel will be owned or demise chartered by a member of the 'International Tanker Owner's Pollution Federation Limited' (ITOPF).

   h) Owner warrants that throughout the duration of this charter, the vessel will be entered in the following Protection and Indemnity Club (P & I) - ..............

2. AMENDMENTS TO THE ASBATANKVOY.
   a) Amendment to Part I, Item K

   Delete "New York (Strike out one)".

   b) Amendment to Part I, Item L

   Delete.

   c) Amendment to Part II, Clause 1

   First line, delete "all convenient", insert "utmost".

   d) Amendment to Part II, Clause 5

   Delete "such cancellation date" insert "vessels arrival at loadport"

   Add at end: "Cancellation or failure to cancel shall be without prejudice to any claim for damages Charterer may have against the Owner".

   e) Amendment to Part II, Clause 6

   Last sentence, after "However," insert: "irrespective of whether the berth is reachable on arrival or not,"

   Last line, add at end: "or demurrage".

   Add at end: "In any event Charterer shall be entitled to six hours notice of readiness at loading and discharge ports, even if the vessel is on demurrage".

   f) Amendment to Part II, Clause 7

   Add, in each instance, after "used laytime": "or time on demurrage".

   g) Amendment to Part II, Clause 8

Second sentence, after "If, however," insert: "delays occur and/or", and after, "...or consignee of the cargo," inser "such delays shall count as half laytime, or if on demurrage".

Last sentence, delete "..for any demurrage.."

Add at end: "The Charterer shall not be liable for any delays caused by 'awaiting tide' and/or waiting daylight and/or awaiting pilot(s) and/or awaiting tug(s)."

h) Amendment to Part II, Clause 9

Delete, "..reachable on her arrival..".

i) Amendment to Part II, Clause 12

Delete Clause 12 in full and insert:

"Except where freight and/or specified port calls are agreed on a lump sum basis, dues and other charges upon the vessel, including those assessed by reference to the quantity of cargo loaded or discharged and any taxes or freight whatsoever shall be paid by the Owner, and dues and other charges upon the cargo shall be paid by Charterer. However, notwithstanding the foregoing, where under a provision of "Worldscale" and where freight and/or specified port calls are not agreed on a lump sum basis, a due or charge is expressly stated to be for the account of Owner or Charterer then such due or charge shall be payable in accordance with the provision of "Worldscale".

Where freight and/or specified port calls are agreed to be on a lump sum basis, such lump sum rate is inclusive o all dues and charges whether levied upon the vessel, freight, or cargo."

j) Amendment to Part II, Clause 20 (b) (iii)

Delete '1950', insert "1974 as amended 1990, and 1994".

k) Amendment to Part II, Clause 24

Delete Clause 24, refer Rider Clause 8.

3. **BILL(S) OF LADING/INDEMNITY CLAUSE.**
Discharging port(s) or range(s), shown in Bill(s) of Lading not to constitute a declaration of discharging port(s) or range(s) and Charterer to have the right to order the vessel to any port within the terms of this charter.

Where and when specifically instructed to do so by Charterer, Owner agrees to release the cargo onboard in the following cases:

a) If no original Bill of Lading is available at discharge port(s) or;

b) If vessel is ordered to discharge in a port different from the destination as shown in the Bill of Lading.

In consideration of Owner complying with Charterer's specific instructions, as above, Charterer shall, upon giving formal notification to Owner, invoke the following indemnity:

1. To indemnify Owner(s), Owner(s) servant(s) and agent(s) and to hold Owner(s) and them harmless in respect of any liability loss or damage of whatsoever nature which they may sustain by reason of Owner(s) causing the vessel to proceed to port(s) other than that named in the Bills of Lading and causing the vessel to deliver the cargo at such port(s) without the production of the Bills of Lading. Further, if Charterer requests Owne (s) to deliver the cargo to a person or persons other than the holders of the Bills of Lading to indemnify Owner(s) and hold Owner(s) harmless in respect of any loss or damage of whatsoever nature which Owner(s) may sustain by reason of Owner(s) doing so.

2. To pay Owner(s) on demand the amount of any loss or damage of whatsoever nature which the Master and/or agent(s) of the vessel and/or any other of Owner(s) servant(s) or agent(s) whatsoever, may incur as a result of the vessel proceeding and delivering the cargo as set out in paragraph 1, hereof.

3. In the event of any proceedings being commenced against Owner(s) or any of Owner(s), servant(s) or agen (s) in connection with the vessel having proceeded as aforesaid or having delivered the cargo in accordance with

Charterer's request, to provide Owner(s) or their servant(s) or agent(s) from time to time on demand with sufficie[illegible] funds to defend the said proceedings.

4. If the vessel or any other vessel or property belonging to the Owner(s) should be arrested or detained or if the arrest or detention thereof be threatened, to provide on demand such bail or other security as may be require[illegible] to prevent such arrest or detention or to secure the release of such vessel or property and to indemnify Owner(s) in respect of any loss, damage or expenses caused by such arrest or detention whether or not the same may be justified.

5. If called upon to do so at any time while the goods are in Charterer's possession, custody or control, to redeliver the same to Owner(s).

6. To produce and deliver up to Owner(s), duly discharged all of the Bills of Lading for the cargoes signed by the Master or on his behalf, as soon as they have arrived and/or come into Charterer's possession.

7. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon Owner(s) proceeding first against any person, whether or not such person is party to or liable under this indemnity.

8. This indemnity shall be construed in accordance with English Law and each and every person liable under this indemnity shall at Owner's request, submit to the jurisdiction of the High Court of Justice of England.

The above indemnity shall automatically be null and void upon presentation of the relevant Bill of Lading, or 13 (Thirteen) months after completion of discharge of cargo to which such indemnity is relevant.

4. **POSITION CLAUSE**
Owners warrant that the vessel is open at_________ with an E.T.A at charterers intended load port of _______ weather and safe navigation permitting. Owners to advise charterers, immediately, of any change in E.T.A of more than 12 hours.

5. **ADDRESS COMMISSION.**
Two point five per cent (2.5%) address commission on freight, deadfreight and demurrage, which Charterer's are at liberty to deduct from freight, deadfreight and demurrage payments.

6. **WEATHER CLAUSE.**
Any time lost at load and/or discharge port(s), whenever/howsoever lost, which is directly/indirectly attributed to weather conditions and/or 'sea state', shall count as half laytime or if the vessel is on demurrage, at one half demurrage rate.

7. **THIRD PARTY ARREST CLAUSE.**
In the event of arrest or other sanction levied against the vessel or Charterer arising out of Owner's breach or an[illegible] fault of Owner, Owner shall indemnify Charterer for any damages, penalties, costs and consequences and any time vessel is under arrest is fully for Owner's account

8. **LAW AND LITIGATION CLAUSE.**
This charter shall be construed and the relations between the parties determined, in accordance with the laws of England.

Any dispute arising out of or in connection with this charter, involving amounts in excess of US$ 50,000 (United States Dollars Fifty Thousand) shall be subject to the jurisdiction of the English High Court.

Any dispute arising out of or in connection with this charter involving amounts up to and including US$ 50,000, (United States Dollars Fifty Thousand) shall be referred to arbitration by a single arbitrator in London in accordance with the provisions of the London Maritime Arbitrators Association (LMAA) Small Claims Procedure.

9. **CLAIMS CLAUSE.**
Charterer shall be discharged and released from all liability in respect of any claims Owner(s) may have under thi[illegible] Charterparty (such as but not limited to, claims for deadfreight, demurrage, port expenses, shifting expenses), unless claim has been presented in writing to Charterer with all available supporting documents within 90 (ninety[illegible] days from completion of discharge of cargo carried under this Charterparty.

10. **OVER-AGE INSURANCE.**
Over-age insurance on cargo owing to vessel's age shall be for Owner's account. (If over 15 years).

11. **WAR RISK CLAUSE.**
Increase of hull and machinery 'War Risk Premiums' and 'Crew War Bonus' over and above those in effect on th[illegible] date of the Charterparty, will be for Charterer's account. Any premiums or increases thereto attributable to closur[illegible] i.e. blocking and trapping insurance, shall be for the Owner's account. Surcharges which are in effect on the date of this Charterparty are for Owner's account for the first 14 (fourteen) days, thereafter Charterer's account.

For the purposes of this clause, a war risk area will constitute that which has been declared a war risk area by

'The War Risks Rating Committee in London', as recognised by Lloyd's of London. In addition, any increase in insurance premiums to be limited to that declared by 'The War Risks Rating Committee in London', as recognise by Lloyd's of London.

Charterer(s) to have the benefit of any rebates Owner(s) receive.

**12. ADDITIONAL OIL POLLUTION INSURANCE CLAUSE.**
Owner warrants that they have and will maintain throughout the period of this charter:

(a) The standard oil pollution insurance cover (currently US$ 1 Billion) available from their P & I Clubs; and

(b) Any additional oil pollution insurance cover which becomes available via their P & I Club or through underwriters providing first class security.

(c)

i) Owner(s) to provide written evidence of (a) and (b) from their P and I Club and/or underwriters providing first class security.

ii) Such documented evidence to be received by Charterer within one normal working day of the day the fixture was confirmed.

iii) If such documented evidence has not been received by Charterer before the indicated period then Charterer shall have the option to either cancel the charter or extend the period under ii) by a further working day

**13. CARGO RETENTION CLAUSE.**
In the event that any cargo remains on board upon completion of discharge, Charterer shall have the right to deduct from freight an amount equal to the FOB load port value of such cargo plus an apportionment of freight, with respect thereto, provided that the volume of cargo remaining onboard is liquid and pumpable by the vessel's pumps, or would have been liquid and pumpable but for the fault or negligence of Owner(s), the Master, the vessel or her Crew (including, but not limited to incorrect trim and incorrect heating procedures), as determined b surveyor appointed by Charterer and acceptable to both Owner and Charterer, whose findings shall be final and binding.

Any action or lack of action in accordance with this provision, shall be without prejudice to any other rights or obligations of the parties. For the purposes of this clause, any surveyor who is ISO 9002 certified, shall be considered acceptable to both Owner and Charterer.

**14. DRUG AND ALCOHOL ABUSE CLAUSE.**
Owner warrants that it has a policy on drug and alcohol abuse applicable to the vessel which meets or exceeds the standards in the 'Oil Companies International Marine Forum guidelines for the control of drug and alcohol onboard ship, O.C.I.M.F. January 1995'. Owner further warrants that this policy will remain in effect during the term of this charter and that Owner shall exercise due diligence to ensure that this policy is complied with.

**15. INTERNATIONAL SAFETY MANAGEMENT (ISM) CODE.**
Owner warrants that a 'Safety Management System (SMS)' in accordance with the 'ISM Code' will be in operatio throughout the duration of this charter. It is a condition of this Charterparty that on and after 1st July 1998 the Owners or "the Company" (as defined by the ISM Code) shall have a valid 'Document Of Compliance (DOC)' anc the vessel shall have a valid 'Safety Management Certificate (SMC)'. Upon request the Owner(s) shall provide a true copy of the relevant DOC and SMC to the Charterer.

Without limitation to Charterer's remedies under this clause, Owner shall indemnify the Charterer for any losses, damages or expenses directly/indirectly attributed to vessel's non-compliance with the ISM code and/or to Owner's failure to respond (or delay in responding) to Charterer's request for the foregoing certificates and any delays, to the extent arising from such non-compliance or failure/delay in responding, shall not count as laytime o if vessel is on demurrage, as time on demurrage.

**16. OIL COMPANY APPROVALS CLAUSE.**
Owner warrants that the vessel is approved by the following companies and will remain so throughout the duratio of this Charterparty (Owner'(s) to advise, including inspection dates and expiry dates)

**17. ELIGIBILITY CLAUSE.**
Owner warrants that the vessel is in all respects eligible and not prevented for any reason whatsoever for trading to the ports and places specified in Clauses C and D hereof and that at all necessary time, she shall have onboard all certificates, records and other documents required for such services. If any element of this warranty : breached, any delay resulting therefrom shall not count as laytime, or if the vessel is on demurrage, as time on demurrage and Owner shall indemnify Charter for any damages or expenses incurred as a result of such breach.

**18. UNITED STATES OIL POLLUTION ACT OF 1990 (OPA-90).**
Owner warrants:

a) That they and/or the vessel operator has submitted to the United States Coast Guard for approval a response plan for the vessel (VRP) which meets in full the requirements of the United States Oil Pollution Act of 1990, the Government Regulations issued thereunder and any change, rule or regulation in substitution of, or supplementary to, such Circular (collectively 'VRP Requirements').

b) That the VRP is approved and the vessel is operated in compliance therewith, when and as required by the VRP requirements.

c) That the Owner or operator of the vessel and the vessel fully meets all other requirements of OPA and any Government's Regulations or guidelines issued thereunder.

This clause does not in any way lessen the overall effect or relieve the Owner of any State obligations in respect of Vessel Response Plans or other pollution requirements.

19. **UNITED STATES COAST GUARD (USCG) CLAUSE.**
Owner warrants during the term of this charter the vessel will fully comply, if not in compliance will hold necessary waivers, with all applicable United States Coast Guard Regulations now in effect, including, but not limited to, pollution and safety regulations of the Code of Federal Regulations, as amended, and all other applicable state pollution and safety laws, rules and regulations as may be promulgated and subsequent amendment thereto.

The vessel is to have valid certificate(s) onboard complying to the above regulations at all times during the currency of this Charterparty.

Owner to indemnify Charterer for any penalties, costs or consequences resulting from vessel's non-compliance and any delays shall not count as used laytime or time on demurrage if vessel is on demurrage.

20. **U.S. CUSTOMS REGULATION CLAUSE.**
Owner warrants that, in accordance with U.S. Customs Regulation 19 CFR, section 4.7A and 178.2 as amended, they have the standard carrier Alpha code (SCAC) which will prefix a Bill of Lading serial number and a Form A. The 'Unique Identifier' is to be entered on all Bills of Lading, cargo manifest, cargo declarations and other cargo documents issued under this Charterparty relating to the carriage of goods to the United States. Charterer is not responsible for any losses or delays resulting from Owner's failure to comply with the foregoing.

Owners warrant that they are aware of the requirements of the U.S Bureau of Customs and Border Protection ruling issued on December 5th 2003 under Federal Register Part II Department of Homeland Security 19 CFR Parts 4, 103, et al. and will comply fully with these requirements for entering U.S ports.

21. **ISPS.**
(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and the Company. Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or the Company to comply with the requirements of the ISPS Code or this Clause shall be for the Owners account.

(b) (i) The Charterers shall provide the CSO and or the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and or the SSO/Master.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers account

22. **VACUUM GASOIL (VGO)/ LOW SULPHUR WAXY RESIDUE (LSWR) CLAUSE.**
If loading VGO or LSWR and the previous cargo was fuel oil, marine diesel oil, VGO or gasoil, it is essential that no tank cleaning is performed prior to loading except to ensure that all tanks, lines and pumps are stripped dry and drained of any previous cargo. Furthermore the R.O.B./O.B.Q. should not exceed 0.1 per cent of cargo quantity and that these should not contain water.

After all other cargoes, the following tank cleaning must be performed.

1. Hot machine wash all tanks designated to carry VGO/LSWR (water pressure 150 psi, temperature 150 deg Fahrenheit).

2. Strip tanks completely dry and drain all lines and pumps of water.

3. a) Thoroughly wash all tanks, lines and pumps designated for VGO/LSWR with fresh water to eliminate al traces of salt water.

b) Drain pumps and lines.

c) Dry out tanks.

4. Irrespective of previous cargo, where salt water ballast has been loaded into cargo tanks designated for VGO/LSWR, the vessel shall:

a) On completion of de-ballasting strip tanks dry.

b) Drain pumps and lines.

c) Fresh water rinse all salt water contaminated tanks, lines and pumps.

d) Drain pumps and lines.

e) Dry out tanks.

f) Where possible, load first into tanks which previously contained ballast to at least 25 pct full before switching to other tanks.

5. Regardless of previous cargo, prior to loading, all heating coils must be blown through with steam to ensure there is no entrapment of salt water through heating coil leakage.

6. Heating: Throughout the voyage and discharge, the vessel should maintain loaded temperature or a temperature of plus 15 deg C higher than cargo pour point whichever is higher.

23. **PART CARGO.**
The "Worldscale" freight rate for tonnage loaded in excess of minimum agreed quantity will be at 50% (fifty percent) of the agreed "Worldscale" freight rate(s) except where lump sum rates have been agreed.

24. **COMMINGLE CLAUSE.**
Charterer to have the right to commingle the cargo in vessel's tanks and Master to execute this operation as per Charterer's instructions subject to ship's safety.

25. **HEATING UP CLAUSE.**
If required by Charterer's, vessel shall raise cargo temperature but always to a maximum of 135 degrees Fahrenheit. Additional costs associated with increasing cargo temperatures to be reimbursed to Owner by Charterer at cost, payable against Owner's invoice and supporting documentation.

26. **SAMPLING CLAUSE.**
Charterer to have the liberty to order the vessel to call at a port for sampling purposes. All port costs to be for the Charterer's account and all time lost to count as used laytime or time on demurrage, if vessel is on demurrage.

27. **BLENDING CLAUSE.**
Charterer to have the option of discharging part or all cargo in one safe port and reloading same port for further discharge within the agreed ranges. Time at the discharge/reload port to count as laytime or if vessel is on demurrage, as time on demurrage in accordance with Charterparty terms and conditions. Freight always to be based on the maximum Bill of Lading quantity carried on any part of the voyage, or the minimum quantity as per Charterparty, which ever is the greater. Reload port to be considered as second loadport for freight calculation purposes.

28. **LIGHTERAGE CLAUSE.**
If lightering/ship to ship (STS) is required at any designated port, safe place or anchorage, time consumed performing this operation (including back loading) shall count as laytime or time on demurrage in accordance with Charterparty terms and conditions. In either event, time shall commence six (6) hours after anchoring or whenever the lighterage/STS craft is all secure alongside, whichever occurs first. The anchorage, STS or lighterage area shall not be considered as an additional port or berth and any running time from such lighterage area shall not count as laytime or time on demurrage.

29. **PUMPING CLAUSE.**
Owner(s) to agree to discharge the entire cargo within 24 hours or maintain 100 P.S.I. (pounds per square inch) a the ships rail provided the shore facilities permit. If shore facilities do not permit discharge within agreed time, then Master to keep pumping logs and issue a letter of protest and to make best endeavours to have both countersigned by the terminal.

Should it become necessary to withdraw the ship from berth because of her failure to maintain the discharge rate all time and expenses incurred are to be for Owner's account.

30. **DIVERSION CLAUSE.**
Notwithstanding anything else to the contrary in this Charterparty, and notwithstanding what loading and/or discharging port(s)/range(s) may have been nominated and Bill(s) of Lading issued. The Charterer shall have the right to change its nomination of the loading and/or discharging ports in accordance with Part 1, C and D of the charter. Any extra time and expenses incurred by Owner in complying with Charterer's orders shall be for Charterer's account and calculated in accordance with Part II, Clause 4, of this Charterparty. Charterer shall have the right to make as many changes as it deems necessary.

31. **INTERIM PORTS CLAUSE. (where applicable)**
Charterer shall pay for any interim Load/Discharge port(s) at cost. Time for additional steaming, which exceeds direct route from first Loadport to furthest Discharge Port, shall be paid at the demurrage rate plus bunkers consumed, plus actual port costs, if any. The reasonable, estimated costs will be payable as an on account payment together with freight, followed by final invoice plus all supporting documents as soon as possible but not later than 90 days after completion of this voyage.

32. **OPERATIONS CLAUSE.**
A) CLEAN BALLAST.

The vessel is to arrive at the loadport with clean ballast. However, in the event vessel discharges any ballast, notwithstanding the terms and conditions of part II of the Charterparty or "Worldscale", such related time and cost to be for Owner's account.

B) CRUDE OIL WASHING.

Vessel will routinely employ Crude Oil Washing (COW) on discharge in accordance with the procedures describe in the ICS/OCIMF 'Guidelines for Tank Washing with Crude Oil', in the absence of express contrary instructions c the Charterer or prohibition by port or terminal regulations.

Owner(s) agree to comply with applicable port and terminal regulations and, as necessary, to submit any advanc information or technical data that may be required by local authorities relative to the conduct of COW operations.

33. **AGENTS CLAUSE.**
Owner to appoint their (Owner's) ship agent's in accordance with Charterer's suggestion at load and discharge port(s).

34. **OPERATIONAL COMPLIANCE CLAUSE.**
Voyage orders to constitute part of this charter.

Owner shall indemnify Charterer for any damages, delays, costs and consequences of not complying with Charterer's voyage instructions given in accordance with the Charterparty.

The vessel is to give ETA notices in accordance with Charterer's voyage instructions and where time permits at least 72/48/24 hours prior to arrival at load and discharge ports. When such ETA notices are not given, any resulting delay at either load or discharge port(s), to be for Owner's account.

OBS!

The vessel shall not tender Notice of Readiness prior to the earliest layday date specified in this Charterparty and laytime shall not commence before 06:00 hours local time on the earliest layday unless Charter consents in writing.

If a conflict arises between terminal orders and Charterer's voyage instructions, the Master shall stop cargo operations and contact Charterer immediately. The terminal orders shall never supersede Charterer's voyage instructions and any conflict shall be resolved prior to resumption of cargo operations.

35. **EARLY LOADING CLAUSE.**
If Charterer permits vessel to tender NOR and berth prior to commencement of laydays, ~~all~~ but time from berthing until commencement of laydays to be credited to Charterer(s) ~~against time used at discharge port(s).~~

36. **CARGO DOCUMENTS CLAUSE.**
Maximum 3 hours for Owner's account for delays solely due to awaiting delivery of cargo documents, after hoses have been disconnected.

37. **EXCESS BERTH OCCUPANCY CLAUSE.**
If after the disconnection of hoses, the vessel remains at the berth exclusively for the vessels' purposes, the Owner will be responsible for all direct, or indirect, costs charged to Charterer(s) by the terminal, the supplier(s) o the receiver(s). Alternatively vessel shall vacate the berth immediately upon the terminals request.

38. **WAITING VOYAGE ORDERS CLAUSE.**
Charterer to have the liberty of instructing the vessel to wait for orders at a safe place. Time to count as used laytime or time on demurrage, if vessel is on demurrage.



**39. SPEED CLAUSE.**
The vessel shall perform the laden passage at .................. knots weather and safe navigation permitting.

Charterer shall have the option to request the vessel to increase her speed with Charterer reimbursing Owner for the additional bunkers consumed at replacement cost.

Charterer shall also have the option to request the vessel to reduce her speed on laden passage. Additional voyage time shall count against laytime or time on demurrage, if vessel is on demurrage and the value of any bunkers saved shall be deducted from any demurrage claim Owner(s) may have under this Charterparty with the value being calculated at replacement price.

Owner shall provide documentation to fully support the claims and calculations under this clause.

**40. SOUTH EAST ASIA CLAUSES.**
a) Chinese River Ports.

If the vessel is required to discharge at non-coastal Chinese ports/berths, all extra inbound transit time in the rive in excess of normal steaming time, is to count as laytime or time on demurrage, if vessel is on demurrage. For purposes of calculating extra transit time, time is to count upon expiry of 6 hours after arrival at first inbound pilot station, until arrival at customary anchorage for such port/berth.

All extra transit time upto dropping outbound river pilot, in excess of the normal outbound steaming time in the river, to count as laytime or time on demurrage, if vessel is on demurrage.

b) Korean Laytime.

In case the vessel arrives at quarantine station and tenders NOR to load between 3 hours before sunset and 010 hours the next day, laytime shall count from 0700 hours the next day.

c) Korean Anchor Dues.

South Korean Anchorage dues in excess of seventy two (72) hours to be for Charterer's account.




Copyright © 2007 Q88.com LLC All rights reserved. Legal Oct 18, 07 10:05:06

H. Total Laytime in Running Hours:

I. *Demurrage per day:*

J. Commission of % is payable by Owner to

on the actual amount of freight, when and as freight is paid.

K. The place of General Average and arbitration proceedings to be London/New York (strike out one).

L. Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter

M. Special Provisions:

*IN WITNESS WHEREOF*, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of: ______________________

By: ______________________

Witness the signature of: ______________________

By: ______________________

# PART II

1. WARRANTY–VOYAGE–CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.

(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

| | *On a voyage to a port or ports in:* |
|---|---|
| ST. KITTS | Carribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| *Place* | *On a voyage to a port or ports in:* |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTER | Mediterranean (from Western Hemisphere). |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. SAFE BERTHING-SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel, shall furnish steam at Charterer's expense for pumping cargo into the Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/ or discharging shall be for account of the Vessel

11. HOSES: MOORING AT SEA TERMINALS Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES-TAXES-WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits-de-quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b). FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a). ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause 1.

17. (a). QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:— any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder, arising or resulting from:—Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING

(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.

(ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv) BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge— the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.



24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfilment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by ______________________________

on board the ______________________ Steamship / Motorship ______________________

whereof ______________________ is Master, at the port of ______________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

to be delivered at the port of ______________________________

or so near thereto as the Vessel can safely get, always afloat, unto ______________________

______________________________________________________________

or order on payment of freight at the rate of ______________________________

______________________________________________________________

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London ______________________

between ______________________ and ______________________ as

Charterer, and all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed ______________________ Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void.

Dated at ______________________ this ______________ day of ______________

______________________

Master

# EXHIBIT 2

# *LAYTIME CALCULATION*

| | | | |
|---|---|---|---|
| VESSEL | BRO PROVIDER | VOYAGE NO. | 29 |
| CHARTERER | PROJECTOR S.A | C/P DATE | 11.10.2007 |
| CARGO | 1 - GASOIL | FIX. NO | 04781 |
| INV. NO. | | YOUR REF. | |

---

| | Count | | % | | |
|---|---|---|---|---|---|
| LOADING - CORPUS CHRISTI | | | | | |
| Vessel arrived / End of seapassage | | 16.10.2007 08:30 | | | |
| Notice of Readiness tendered | | 16.10.2007 09:00 | | | |
| Vessel anchored | | 16.10.2007 09:00 | | | |
| Laytime commenced | Start | 17.10.2007 06:00 | | | |
| Anchor aweigh | End | 17.10.2007 09:20 | | 3 hrs 20 min | |
| Vessel berthed | Start | 17.10.2007 13:05 | | | |
| Hoses connected | | 17.10.2007 19:40 | | | |
| Loading commenced | | 17.10.2007 22:30 | | | |
| Loading completed | | 19.10.2007 02:30 | | | |
| Hoses disconnected | End | 19.10.2007 03:05 | | 38 hrs 0 min | |
| Vessel sailed | | 19.10.2007 08:00 | | | |
| Total time used this port [berth] | | | | 41 hrs 20 min | 41,333 hrs |
| DISCHARGING - LA LIBERTAD | | | | | |
| Vessel arrived / End of seapassage | | 27.10.2007 05:00 | | | |
| Notice of Readiness tendered | | 27.10.2007 06:25 | | | |
| Vessel anchored | | 27.10.2007 06:25 | | | |
| Laytime commenced | Start | 27.10.2007 12:25 | | | |
| Anchor aweigh | End | 31.10.2007 16:15 | | 99 hrs 50 min | |
| Vessel berthed | Start | 31.10.2007 17:35 | | | |
| Hoses connected | | 31.10.2007 18:55 | | | |
| Disch. commenced | | 31.10.2007 19:50 | | | |
| Disch. completed | | 05.11.2007 14:00 | | | |
| Hoses disconnected | End | 05.11.2007 14:15 | | 116 hrs 40 min | |
| Vessel sailed | | 05.11.2007 16:~~00~~ 50 | | | |
| Total time used this port [berth] | | | | 216 hrs 30 min | 216,500 hrs |

| | | | | | |
|---|---|---|---|---|---|
| **Total Time Used** | | | *257 hrs* | *50 min* | **257,833000 hrs** |
| **Less Time Allowed** | | | *84 hrs* | *0 min* | **84,000000 hrs** |
| **On Demurrage** | | | *173 hrs* | *50 min* | **173,833333 hrs** |
| **At Full Rate** | **USD** | **20 000,00 per day** | *173 hrs* | *50 min* | **173,833333 hrs** |

**Total Amount USD 144 861,11**